UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| FRANK R. MATARAZA, | CASE NO. 1:11CV1787 |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| v. | Magistrate Judge George J. Limbert |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. | |

Frank R. Mataraza ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the Commissioner's decision and dismiss Plaintiff's complaint in its entirety with prejudice:

I. **PROCEDURAL AND FACTUAL HISTORY**

On September 12, 2007, Plaintiff applied for DIB, alleging disability beginning September 22, 2006 due to bilateral fractures to his feet, shattered ankles and joints, and memory loss. ECF Dkt. #11 at 105-106, 142, 167.[1] The SSA denied Plaintiff's application initially and on reconsideration. *Id.* at 91-97. Plaintiff requested an administrative hearing and on March 4, 2010, an Administrative Law Judge ("ALJ") conducted an administrative hearing where Plaintiff was represented by counsel. *Id*. at 57, 98. At the hearing, Plaintiff and a vocational expert ("VE") testified. *Id*. On May 19, 2010, the ALJ issued a decision denying benefits. *Id.* at 43-52. Plaintiff filed a request for review, and on June 21, 2011, the Appeals Council denied Plaintiff's request for review. *Id*. at 34-39.

---

[1] Page numbers refer to "Page ID" numbers in the electronic filing system.

On August 25, 2011, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On March 16, 2012, Plaintiff filed a merits brief. ECF Dkt. #12. On June 13, 2012, Defendant filed a merits brief and on June 26, 2012, Plaintiff filed a reply brief. ECF Dkt. #15-16.

## II. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

In her decision, the ALJ determined that Plaintiff suffered from status post bilateral calcaneal fracture, post-traumatic arthritis, right knee strain, cognitive disorder not otherwise specified, mild to moderate amnesic disorder, depression, and post-concussion syndrome , which qualified as severe impairments under 20 C.F.R. §404.1520(c). ECF Dkt. #11 at 45. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. 404.920(d) ("Listings"). *Id.* at 45-46.

The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work which included lifting, carrying, pushing and pulling up to ten pounds occasionally and five pounds frequently, siting up to six hours per eight-hour workday and standing and/or walking up to two hours per workday, with no operating of foot controls, no bending, no climbing of ladders, ropes or scaffolds, only occasional climbing of ramps and stairs, occasional stooping, kneeling, crouching and crawling, and the avoidance of workplace hazards such as heights or dangerous machinery. ECF Dkt. #11 at 47. The ALJ further restricted Plaintiff to simple, routine, low-stress tasks that could be learned within 30 days or less, and tasks not involving high production quotas, piece work, assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others. *Id.*

With this RFC, and the VE's testimony, the ALJ concluded that Plaintiff could not perform any of his past relevant work, but he could perform jobs existing in significant numbers in the national economy such as bench assembler, wire worker, and final assembler. ECF Dkt. #11 at 51.

## III. **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of

-3-

the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.     ANALYSIS

The undersigned addresses Plaintiff's allegations of ALJ error out of the order in which they were presented and in the chronological order of the sequential steps for evaluating entitlement to DIB.

### A.     TREATING PHYSICIANS' OPINIONS

Plaintiff contends that the ALJ failed to attribute proper weight to his treating physicians regarding his memory loss. ECF Dkt. #12 at 606-607. Plaintiff asserts that the ALJ failed to consider the medical notes of his treating physician, Dr. Wilber, and his treating neurologist, Dr. Kutsikovich. *Id.* at 606.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. The ALJ evaluates every medical opinion, but must give controlling weight to the opinions of the claimant's treating physicians on the nature and severity of the impairment. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). A presumption exists that the opinion of a treating physician is entitled to great deference. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled

and he may therefore "'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why she rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

"When a treating physician...submits an opinion on an issue reserved to the Commissioner-such as whether the claimant is 'disabled' or 'unable to work'- the opinion is not entitled to any particular weight." *Turner v. Comm'r of Soc. Sec.*, No. 09-5543, 2010 WL 2294531 at *4, (6th Cir. June 7, 2010), unreported; *see also* 20C.F.R. §416.927(e)(1). "Although the ALJ may not entirely ignore such an opinion, his decision need only explain the consideration given to the treating source's opinion." *Id.* (internal quotation and citation omitted).

Where a treating physician's opinion cannot be given controlling weight, the ALJ must consider and balance the following factors set forth in the Social Security Regulations in determining the weight to give the opinion: "the length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; extent to which the opinion is supported by relevant evidence; extent to which the opinion is consistent with the record as a whole; and whether the treating physician is a specialist in the area on which the disability claim is based." *Wilson,* 378 F.3d at 544; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Opinions of one-time examining physicians and record-reviewing physicians and medical experts who testify during administrative hearings are also weighed under these same factors, including supportability, consistency, and specialization. *See* 20 C.F.R. §§ 404.1527(c), (e); 419.927(c), (e).

Dr. Wilber began treating Plaintiff on October 9, 2006 after Plaintiff underwent surgery on September 23, 2006 to repair bilateral calcaneal fractures and a left ankle fracture sustained after a work-related injury in which he fell twelve feet off of a wall while inspecting the wall. ECF Dkt. #11 at 279. Despite seeing Dr. Wilber once in November of 2006, twice in December of 2006, and

one time each again in January of 2007 through June 4, 2007, it was not until June 28, 2007 that Dr. Wilber documented that Plaintiff complained of problems with his short-term memory since the accident. *Id.* at 279-289. In that note, Dr. Wilber stated that Plaintiff had been complaining of short-term memory loss and "[t]hough it was not well-documented, he [Plaintiff] said that when he did fall, he had a brief loss of consciousness and thinks he had hit his head. As far as he knows, there was no workup. He has never had problems like this before the injury." *Id.* at 289.

Dr. Wilber conducted a physical examination and noted in his assessment that he was concerned about Plaintiff's loss of memory and thought that a neurology consult was indicated since a head injury was never considered or treated before. ECF Dkt. #11 at 289. In his July 30, 2007 treatment note, Dr. Wilber indicated that Plaintiff was denied approval for a neurology consult because no documentation existed in the emergency room showing a head injury. *Id.* at 290. Dr. Wilber wrote:

> [t]his is very misleading, the fact that Frank fell off a wall 12 foot and does tell me there was a period of loss of consciousness which was not completely evaluated and worked up in the emergency room. Just because the emergency room did not full[sic] evaluate this injury does not mean that it did not occur. Frank has significant ongoing problems with memory loss which dates back to the time of his injury and I think it is important for him to have this neurology consult to make sure that we are not missing an injury. We will appeal this decision and try to get neurology consult approved.

*Id.* Dr. Wilber indicated in his August 27, 2007 treatment note that Plaintiff still reported trouble with his memory and they were continuing to appeal the denial of the neurology consult. *Id.* at 291.

On December 6, 2007, Dr. Pickholtz, an agency consulting psychologist, evaluated Plaintiff at the request of the agency. ECF Dkt. #11 at 295-302. Dr. Pickholtz diagnosed Plaintiff with mild to moderate depression, mild cognitive disorder, not otherwise specified, since Plaintiff's accident which needed to be assessed by a neurologist, and mild to moderate amnestic disorder subsequent to Plaintiff's accident. *Id.* at 301. He found that Plaintiff had moderate impairment in his abilities to understand and follow instructions, mild impairment in maintaining attention and performing simple, repetitive tasks relative to speed, consistency and reliability, no impairment in relating to others, and at least moderate impairment in his overall abilities to withstand the stresses and pressures of day-to-day work activities. *Id.* at 300-301. Dr. Pickholtz assessed Plaintiff with an

overall GAF score of 43, and explained that score in the following manner:

> The following ratings were based upon procedures established in the DSM-IV TR Manual. The severity of his current psychiatric complaints relative to his depression and his organic deterioration, I believe falls within the moderate range between 51 and 60, probably at the lower range around 53, as a result of his depression superimposed upon his difficulties with his deterioration in terms of thinking and memory. The severity relative to impact upon social functioning seemed to fall within the mild range at worst and his overall interference.

On March 24, 2008, Dr. Kutsikovich, a neurologist, examined Plaintiff for his complaints of memory loss. ECF Dkt. #11 at 579. In a letter to Dr. Wilber, Dr. Kutsikovich noted that Plaintiff's wife reported that Plaintiff had short-term memory problems with complex tasks, which he had not had prior to the accident. *Id.* Plaintiff indicated that he saw a psychiatrist, who believed he had short-term memory loss and recommended a neurological evaluation. *Id.* Plaintiff reported that he suffered occasional headaches and dizziness, and his memory loss affected his daily activities. *Id.* He reported difficulty following the recent news, difficulty remembering which candidate he followed, sleep difficulties, and trouble with complex directions. *Id.*

Upon physical examination, Dr. Kutsikovich noted that Plaintiff was sometimes slow to respond, could recall only a part of 2/3 complex objects, and had some difficulty knowing current events. ECF Dkt. #11 at 580. Dr. Kutsikovich opined that Plaintiff showed signs of postconcussive syndrome with short-term memory difficulty. *Id.* Dr. Kutsikovich concluded that Plaintiff's memory symptoms were likely secondary to the September 22, 2006 injury since he was highly functional prior to that time. *Id.* He prescribed orders for a head CT and an EEG. *Id.*

Dr. Wilber reported on March 27, 2008 that Plaintiff's major complaint was his memory loss and he had read Dr. Kutsikovich's consultation and hoped that his recommendation of a head CT and EEG would help justify the tests for worker's compensation coverage. ECF Dkt. #11 at 583. On April 24, 2008, Dr. Wilber noted that Plaintiff was still complaining of memory problems and he needed to return to the neurologist for final evaluation and the etiology of the memory loss. *Id.*

On May 19, 2008, Dr. Kutsikovich indicated in a treatment note that Plaintiff had a head CT and EEG, which both revealed normal results. ECF Dkt. #11 at 578. Dr. Kutsikovich noted that upon physical examination, Plaintiff could recall 2/3 objects when asked several minutes into the examination about the objects and complex commands had to be repeated for Plaintiff. *Id.* Dr.

Kutsikovich's impressions included that Plaintiff had postconcussive syndrome status post head injury from September 22, 2006. *Id*. Dr. Kutsikovich opined that

> [i]t is less likely that he [Plaintiff] will be able to do a high stress job although he will give a trial of vocational rehab for the possibility of a low stress job to keep his mind active. He does have some signs of short-term memory loss and did need redirection during today's examination. He was instructed to follow up in three months or call with any changes in his symptoms." *Id*.

On June 19, 2008, Dr. Wilber indicated in a treatment note that Dr. Kutsikovich had concurred that Plaintiff had postconcussive syndrome and that Plaintiff's concentration and memory loss problems were permanent "secondary to his injury." ECF Dkt. #11 at 586. Dr. Wilber indicated that such problems were "going to significantly limit" Plaintiff's ability to find employment. *Id*.

On September 12, 2008, Dr. Wilber completed an assessment of Plaintiff's closed head injury for worker's compensation purposes and found that it was a class 2 mental status rating based upon short-term memory loss and judgment issues. ECF Dkt. #11 at 591. He opined that this injury caused impairment of the whole person of 20%. *Id*. Dr. Wilber indicated that Plaintiff's permanent work-related limitations included no prolonged standing or lifting, occasionally lifting objects weighing no more twenty pounds and frequently lifting objects weighing no more than ten pounds, no climbing or carrying, not being on ladders or scaffolding, and limited work on uneven grounds. *Id.* at 592. He identified no limitations resulting from Plaintiff's mental status. *Id.*

On October 9, 2008, Dr. Wilber noted that Plaintiff was looking for a job and Dr. Wilber indicated that he would define the job restrictions so that Plaintiff would know what kind of job to look for based upon those restrictions. ECF Dkt. #11 at 593.

Contrary to Plaintiff's assertion, the ALJ did address the opinions of Drs. Wilber and Kutsikovich, although she did not identify Dr. Kutsikovich by name. First, she accepted their diagnoses of postconcussive syndrome. ECF Dkt. #11 at 45; ECF Dkt. #11 at 578, 580, 586. She also accepted the agency examining psychologist's additional diagnoses of depression, cognitive disorder not otherwise specified, and mild to moderate amnesic disorder. ECF Dkt. #11 at 45; ECF Dkt. #11 at 301. She listed each of these diagnoses as severe impairments in her Step Two and Step Three analyses. ECF Dkt. #11 at 45-46.

-8-

The undersigned notes that neither treating physician provided employment-related limitations regarding Plaintiff's memory loss. The most that Dr. Wilber stated regarding limitations due to Plaintiff's postconcussive syndrome were in his later treatment notes in which he wrote that Plaintiff continued to have problems with short-term memory loss and such problems would "significantly limit" Plaintiff's ability to find employment and that he would define restrictions for Plaintiff in seeking employment. ECF Dkt. #11 at 586. However, no such limitations were identified. And Dr. Kutsikovich offered no official limitations, only stating in a letter to Dr. Wilber that Plaintiff would not be able to perform a high stress job and had difficulty with remembering complex commands. *Id*. at 578.

The ALJ discussed Plaintiff's memory loss in her decision. She noted that Plaintiff did not assert memory loss as an impairment initially, but he did later raise such an impairment and stated at the hearing that he has decreased memory and struggled at times to find the appropriate words to use in a conversation. ECF Dkt. #11 at 47. She found Plaintiff's postconcussive syndrome to be a severe impairment and she indicated in her decision that she incorporated Dr. Wilber's opinions and findings into her decision as they were consistent with and supported by the evidence. *Id*. at 49. In particular, she cited to Dr. Wilber's medical source statement for the determination of Plaintiff's permanent partial disability for worker's compensation purposes and she accepted Dr. Wilber's findings except for Dr. Wilber's carrying limitation for Plaintiff's physical capacity. *Id*. Dr. Wilber evaluated Plaintiff's closed head injury and resulting short-term memory loss and judgment issues in this medical source statement. ECF Dkt. #11 at 591. However, while finding that Plaintiff's mental status rating was a class 2 that resulted in a 20% impairment of the whole person, Dr. Wilber did not list any employment-related restrictions relating to Plaintiff's short-term memory loss. *Id*.

Moreover, the ALJ accepted Dr. Kutsikovich's impression that Plaintiff would not be able to perform a high stress job and that Plaintiff had difficulty with complex commands. ECF Dkt. #11 at 47. She limited Plaintiff's mental RFC to simple, routine, low-stress tasks that can be learned in 30 days or less and that do not involve high production quotas, piece work, assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others or being

responsible for the safety of others. *Id*.

Thus, while the ALJ could have better articulated her analysis of the treating physician rule and her analysis of Dr. Wilber and Dr. Kutsikovich's notes and records, she did adequately accommodate the limited findings and opinions of these treating physicians. She indicated the weight given to Dr. Wilber's opinions, which failed to specify limitations from Plaintiff's memory loss, and she actually incorporated the limitations which were only provided by Dr. Kutsikovich in a letter to Dr. Wilber.

She thereafter determined a mental RFC based upon the findings of Plaintiff's treating physicians, the opinions of the state agency physicians, and the objective medical and nonmedical evidence. Social Security Ruling 96–8p requires that the ALJ's RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." As to the objective medical evidence, the ALJ explained that her mental RFC was consistent with the objective medical evidence, such as the CT scan of the brain which showed normal results. ECF Dkt. #11 at 48. She also set forth the findings of Dr. Pickholz which also supported her mental RFC for Plaintiff. *Id*. Dr. Pickholz had found, despite his GAF of 43 for Plaintiff, that Plaintiff's mental health examination was rather unremarkable and Plaintiff had moderate limitations in understanding and following instructions, mild limitations in maintaining attention and performing simple repetitive tasks, no limitations in relating to others, and at least moderate impairment in withstanding the stresses and pressures of day to day work "relative to the type of work he did in the past." *Id*. at 300-301. The ALJ cited Dr. Pickholz's findings and gave them weight, but gave no weight to his GAF of 43 as it was not supported by his unremarkable mental examination of Plaintiff or by Plaintiff's post-onset work history and wide range of daily activities. *Id*. at 49. The ALJ also cited to the findings and opinions of Dr. Goldsmith, a state agency reviewing psychologist, who found that Plaintiff had moderate limitations in following and understanding instructions, no severe limitation in maintaining attention or concentration or in relating to others, and moderate limitation in handling the stress of daily work tasks. *Id*. at 320.

The ALJ cited Plaintiff's post-onset work activity, which included his ability to be a project manager on construction work since his alleged onset date and his ability to run his own business doing construction work after his disability onset date. ECF Dkt. #11 at 49. Plaintiff's tax returns showed that he was self employed in the construction business and he testified as to his post-onset date work activities. *Id*. at 49, 64-68. Plaintiff also testified that he was able to work on a classic car that he owned and he performed construction work for friends. *Id.* at 70-76.

Since the ALJ adequately addressed the opinions of Drs. Wilber and Kutsikovich, and accommodated their limitations to the extent they were provided, and otherwise had substantial evidence to support her treatment of these opinions and her mental RFC for Plaintiff, the undersigned recommends that the Court find that Plaintiff's assertion of a treating physician rule violation has no merit.

### B.  **STEP FOUR–RFC**

Plaintiff contends that the ALJ should not have considered his ability to perform part-time work in determining that he could perform sedentary work. ECF Dkt. #12 at 607. The ALJ had found that "the fact that he[Plaintiff] worked at a light-to-heavy level job even on a part-time basis since his injury is strong evidence establishing he is capable of at least sedentary level employment." ECF Dkt. #11 at 49.

Even assuming that the ALJ erred in using the fact that Plaintiff performed part-time work in determining a sedentary RFC, this alleged error would be harmless as it was only one in a myriad of cited reasons why the ALJ determined a sedentary level of work for Plaintiff. She cited to Dr. Wilber's medical source statement for worker's compensation purposes whereby he opined that Plaintiff could perform light level work, a level of work higher than that determined by the ALJ. ECF Dkt. #11 at 49. She also cited to the findings and opinions of Dr. Bolz, a state agency reviewing physician, who also opined that Plaintiff could perform light work. *Id*. at 50. The ALJ also cited to Plaintiff's testimony and a third-party report from his wife stating that Plaintiff repaired cars and performed household chores. *Id.* The ALJ also noted Plaintiff's testimony that he could lift up to twenty pounds two-thirds of the day, but nevertheless determined that he could lift up to only five pounds frequently and ten pounds occasionally. *Id*. at 71. In addition, the ALJ cited to

the January 2008 functional assessment conducted by occupational therapist Marie Hodge who concluded that Plaintiff could lift at the light duty level. *Id*. at 50, citing ECF Dkt. #11 at 479.

For these reasons, the undersigned recommends that the Court find no merit to Plaintiff's contention.

### C.  **STEP FIVE**

Finally, Plaintiff challenges the jobs cited by the VE upon which the ALJ relied in order to find that Plaintiff could perform other jobs existing in significant numbers in the national economy. ECF Dkt. #12 at 604-605. Plaintiff contends that the jobs relied upon by the ALJ at Step Five contradict the RFC that she determined for Plaintiff. *Id*. at 604.

In finding that Plaintiff could perform jobs existing in significant numbers in the national economy, the ALJ cited to the representative occupations of bench assembler, wire worker and final assembler. ECF Dkt. #11 at 51. The ALJ relied upon the testimony of the VE, who testified at the hearing that the hypothetical individual with the limitations provided by the ALJ could perform such occupations. *Id.* Plaintiff asserts that each of these representative occupations is precluded by the RFC determined by the ALJ because the ALJ specifically precluded Plaintiff from performing jobs requiring assembly line work or work involving dangerous machinery. ECF Dkt. #12 at 605-605.

In her RFC for Plaintiff, the ALJ did specifically preclude Plaintiff from performing tasks involving assembly line work or dangerous machinery. ECF Dkt. #11 at 47. At the hearing, the ALJ specifically included these limitations in her hypothetical person to the VE. ECF Dkt. #11 at 82-83. The VE responded that the hypothetical person could not return to Plaintiff's past relevant work but could perform the jobs of bench assembler, wire worker and final assembler. *Id.* at 83. The VE also specifically stated that while his testimony was consistent with the DOT, the DOT does not give employment figures, so the numbers he used at the hearing were from his own experience, as well as data available through the Department of Labor and the Bureau of the Census. *Id.* at 83-84.

Social Security Ruling ("SSR") 00-4p provides in relevant part that:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is

> disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p. An ALJ's failure to comply with SSR 00-4p can constitute either reversible or harmless error. *Bratton v. Astrue*, No. 2:06-0075, 2010 WL 2901856, at *3 (M.D. Tenn. July 19, 2010).

Before the VE testified at the hearing in this case, the ALJ requested that the VE make clear to her "if anything you say is inconsistent with or otherwise departs from information contained in the Dictionary of Occupational Titles and its companion volume, Selected Characteristics of Occupations?" ECF Dkt. #11 at 80. Accordingly, the ALJ fulfilled her "affirmative responsibility" under SSR 00-4p to ask the VE whether his step five testimony was consistent with the DOT. The VE thereafter testified as to jobs that would be available for the hypothetical person that the ALJ proffered and responded that "while my testimony is consistent with the DOT, the DOT of course does not give employment figures." *Id*. at 84. He thereafter noted that the number of jobs available was based upon his own experience and the data from the Department of Labor and the Bureau of the Census. *Id*.

The Court notes that the VE did not report any conflicts between his testimony and the DOT. Since the VE identified no conflicts, the ALJ could rely on his testimony, especially since Plaintiff's counsel was given a full opportunity to cross-examine the VE in this case and indeed did so. ECF Dkt. #11 at 84-87. The Sixth Circuit has held that "nothing in the applicable Social Security regulations requires the administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir.2008), citing *Martin v. Comm'r of Soc. Sec.*, 170 Fed. App'x 369, 374-375 (6th Cir. 2006); *see also Ragsdale v. Shalala*, 53 F.3d 816, 819 (7th Cir.1995) (failure to challenge basis of vocational expert's testimony at administrative hearing constitutes waiver of the issue in the district court).

-13-

Moreover, even if this assertion is not waived, and even accepting that the bench assembler job cited by the VE always requires work on an assembly line, which is not specifically stated in the DOT definition for the occupation, the jobs of wire worker and final assembler also cited by the VE encounter no difficulty with the ALJ's RFC.  The occupation of wire worker, DOT 728.684.022, contains no language regarding work on an assembly line.  And while the job of wire worker in the DOT discusses the use of soldering equipment, which Plaintiff contends is dangerous and thus is also precluded by his RFC, the description does not indicate that soldering is required in every instance of a wire worker's job, as it states that a wire worker "[p]erforms any combination of following tasks involved in cutting, stripping, taping, forming, and soldering wires or wire leads."  DOT 728.684.022.  Finally, no assembly line work or dangerous machinery exposure is mentioned whatsoever in the third job cited by the VE, the job of final assembler, which provides that such a worker:

> Attaches nose pads and temple pieces to optical frames, using handtools; Positions parts in fixture to align screw holes.  Insets and tightens screws, using screwdriver.

DOT Code 713.687.018.

Since Plaintiff's counsel failed to raise a conflict or inconsistency with the DOT at the hearing, and could not otherwise overcome the VE's jobs of wire worker and final assembler as conflicting with the ALJ's RFC, the undersigned recommends that the Court find no merit to Plaintiff's assertion.

## VI. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the decision of the Commissioner and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.

DATE: November 7, 2012.

 */s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).